UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DANIEL B. VAN GUILDER,

    Petitioner,

vs.

ROBERT A. HOREL, Warden,

    Respondent.

No. C 08-3602 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

## BACKGROUND

Petitioner was convicted by a jury of five counts of attempted murder, *see* Cal. Penal Code §§ 664, 187(a), six counts of assault with a deadly weapon by means of force likely to produce great bodily injury, *see id.* § 245(a)(1), and one count of making criminal threats, *see id.* § 422. The jury found that two of the attempted murders were committed willfully, deliberately and with premeditation; that appellant personally used a dangerous weapon in all of the attempted murders; and that appellant used a knife in connection with making criminal threats. All of appellant's convictions arose from an incident during which appellant went on a rampage in his vehicle, attempting to run down numerous victims, including his four-year-old daughter and six-year-old stepdaughter. He was sentenced to prison for twenty-one years and four months, plus two consecutive life terms.

He does not dispute the following facts, which are excerpted from the opinion of the California Court of Appeal:

> By July 2004, appellant's marriage to Jane Doe had deteriorated and he was living outside the home. They had a daughter together, age four, and Jane Doe had a daughter, age six, from a prior relationship.
>
> On July 30, 2004, appellant called Jane Doe and asked her to bring him some items of property, including a television. Jane Doe reluctantly agreed after appellant promised not to be there during the drop off. Jane Doe arrived with the two girls and the property at about 7:15 p.m. As she began to unload her van, appellant showed up and began talking with Jane Doe. At one point, he asked her to hug him, but she refused his advances. He also spoke with the girls, who were happy to see him and asked him when he was coming home.
>
> Jane Doe said, "No, I can't do this. I have to go." Appellant started cursing and threatening to kill himself. She got in the van with the girls and left. Appellant was very angry and went into his trailer and grabbed a bottle of pills. In the presence of his roommate, he threatened to kill himself.
>
> When Jane Doe was stopped at a red light on her way home, appellant pulled up alongside of her and began screaming that he was going to kill himself and that he wanted her to watch. He started dumping a vial of pills down his throat and washing them down with soda. The girls were screaming and crying.
>
> When the light turned green, Jane Doe drove into a shopping center parking lot in an effort to get help. As Jane Doe pulled into the parking lot, appellant began to ram the rear of her van with his Blazer. She described appellant's 1986 Blazer as "a real big vehicle" as appellant had "it lifted up higher and it has chrome rails across the front of the vehicle and he has step ups on it because it's so high up in the air." He continued to ram the van repeatedly with such force that Jane Doe was fearful that her van was going to tip over. During one of the rams, the van's rear window shattered, showering glass throughout the interior of the vehicle and onto the girls.
>
> Jane Doe stopped in the parking lot and got out of the van in an effort to calm appellant, and to divert his attention away from the girls, thereby giving them a chance to exit the van. At some point, when Jane Doe was at the passenger side door of the Blazer trying to calm appellant, he pulled on her shirt, ripping it, and then hit her several times in the chest, causing bruising. Appellant told Jane Doe to get into the Blazer, or he was going to kill the girls. He displayed a knife when the threat was made.
>
> Kory Hopkins and his wife saw Jane Doe's van being rammed in the parking lot. His wife said "we need to help them," so Kory drove his Yukon to the area of the altercation and parked. He approached appellant, attempting to diffuse the situation. When appellant told him to "shut the fuck up," he returned to his vehicle.
>
> The girls opened the van door and ran out screaming and crying. They were brought over to Kory Hopkins's Yukon and were being comforted by Hopkins and his wife, as well as three ladies who ran over to help -- Kathy

Rich, Amber Eames and Brittany Guerrero. Everyone was congregated around the Yukon's driver's side door.

Appellant then accelerated and headed straight for the group. Amber Eames ran to her left towards the front of the Yukon in order to get out of the way of the speeding Blazer. Kathy Rich picked up the four-year-old and placed her on her hip and pulled the six-year-old by her hand and they jumped out of the way of the speeding Blazer. Kathy Rich estimated the Blazer missed her and the girls by less than two feet before crashing into the driver's side of the Yukon in the exact location where they had been standing. Kory Hopkins, who had jumped into the open door of his Yukon in an attempt to move his vehicle, was knocked momentarily unconscious and woke up on the pavement. The Yukon was totaled.

Police arrived on the scene, which one officer described as "mass chaos," and were directed to appellant, who was seated in his Blazer. After a brief struggle, officers were able to remove appellant forcibly from the Blazer, and to place him under arrest. After his arrest, appellant was taken to an emergency room where he was treated for an overdose of Seroquel. His blood test was positive for Quetiapine and Lorzepam, both of which are prescription antipsychotic medications.

There was no material issue at trial as to appellant's participation in the charged offenses. Appellant's defense instead centered on his purported inability to form the requisite mental state for attempted murder. Specifically, the defense claimed that he could not premeditate and deliberate and that he did not harbor the specific intent to kill. Defense counsel indicated "there is nothing in the evidence to suggest that this man who's suicidal, who's agitated, who's full of Seroquel is making a conscious decision, having reflected, to kill anyone." Counsel claimed "it was an act of desperation, it was a man who lost everything, had nothing left, and was acting out in a rage."

Ex. F2-4.[1]

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to

---

[1] Citations to "Ex." are to the record lodged with the court by the Attorney General.

3

mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**DISCUSSION**

**I.   Petitioner's Claims**

As grounds for habeas relief, petitioner asserts that: (1) His Fifth, Sixth and Fourteenth Amendment rights were violated when a district attorney's investigator gave the prosecution a CD containing recordings of jail telephone calls between petitioner and his

4

counsel; and (2) there was insufficient evidence to support the verdict on counts eight, thirteen and fifteen.

### A. Interception of Attorney-Client Conversations

The court of appeal described the background for this claim:

> On March 21, 2005, District Attorney Investigator Kim Dayton requested that the jail check all phone calls made by appellant since his incarceration on July 30, 2004. [FN3. It is well established that a jail may monitor and record a prisoner's telephone calls. (People v. Plyler (1993) 18 Cal.App .4th 535, 542.)  It is also entirely permissible for the prosecution to obtain these calls and seek to introduce them against the prisoner at trial. (People v. Riel (2000) 22 Cal.4th 1153, 1184 .)  However, it is equally as well established that the jail may never record a prisoner's conversations with his or her attorney. (§ 636; People v. Jordan (1990) 217 Cal.App.3d 640, 646.)] On March 29, 2005, Investigator Dayton received a CD on which the telephone conversations were recorded. In reviewing the CD, she heard about 25 to 30 seconds of a call appellant made to defense counsel.  As soon as she heard defense counsel's voice, she stopped listening.
>
> That same day, Investigator Dayton sent an e-mail to Robert Waner, the deputy district attorney prosecuting the case.  In that message, she stated that while randomly listening to the telephone conversations provided by the jail, she heard a portion of a conversation between appellant and his attorney, Jill Ravitch.  She described the content of the conversation as appellant talking with Ms. Ravitch about retaining her.  Investigator Dayton also wrote that she "will not discuss anything I heard in the phone call with anyone."  She also indicated she had checked the phone call print out and found other telephone calls to Ms. Ravitch's telephone number.
>
> On March 30, 2005, Investigator Dayton sent another e-mail to Mr. Waner informing him that she had found an additional four telephone calls to the attorney's telephone number.  Later that day, Ms. Ravitch received a telephone call from Mr. Waner alerting her to the fact that the District Attorney's Office was in possession of recordings of her telephone conversations with her client.  In this message, Mr. Waner stated that Investigator Dayton had notified him of the problem and that she had not relayed to him anything that she had heard.
>
> On April 7, 2005, all appellant's recorded jail phone calls were turned over to the court and sealed.  On July 29, 2005, the defense filed a motion to dismiss the case alleging prosecutorial misconduct.  At a hearing held on October 3, 2005, the court, in camera, listened to seven recorded phone calls between appellant and his defense counsel.
>
> At that hearing, testimony was received from Judy Brubaker, the Information Bureau Manager for the Sonoma County Jail regarding the jail's telephone recording system.  She testified that beginning in May 2004, the Sonoma County Jail implemented a new jail telephone system, whereby inmate calls are recorded and stored in Alabama.  Under the new telephone system, instead of tracking inmate's calls by the outgoing telephone number, each prisoner was assigned a pin number and calls were tracked by pin number.  Thus, all of a particular inmate's telephone calls could be retrieved

> without knowing the telephone numbers that the inmate called.
>
> The inmate phone system records all phone calls from inmates except for those that are made to numbers on the "do not record" list. That list includes numbers for attorneys, public defenders, and probation officers. Attorneys who call the jail and follow up with a letter on letterhead will be put on the "do not record" list after the jail verifies that they are attorneys. In the current case, appellant's counsel's phone number was not on the "do not record" list and her phone calls were accidentally recorded by the jail. As soon as it was learned from the district attorney that calls from appellant to his counsel were being recorded, his counsel's number was placed on the "do not record" list.
>
> In denying appellant's motion to dismiss the case, the trial court concluded that there was no prosecutorial misconduct. The court found credible Investigator Dayton's testimony that she accessed only one conversation between appellant and his attorney and; based on the court's in camera review, the court found that there was nothing in that conversation that would result in prejudice to appellant. The court then stated that defense counsel could object to any specific item of evidence that she believed might have been discovered as a result of the phone conversation, and that the prosecutor would have the burden of proving that the evidence came from a source other than the recorded conversations.

Ex. F at 4-9.

The court of appeal noted that sometimes dismissal is required if governmental misconduct is sufficiently outrageous, but concluded that here the conduct of the district attorney's investigator was not "intentional, outrageous, shocking to the conscience or otherwise egregious. . . . the recording of the privileged attorney-client conversations was accidental; at most negligent." *Id.* at 9. The court also concluded that there was no prejudice. *Id.*

### 1. Exhaustion/Procedural Default

Respondent contends that petitioner failed to present this claim to the California Supreme Court. He asserts that petitioner's argument for this issue in his petition for review was insufficient to constitute "fair presentation" of the federal claim, and that it was not presented by any other route, such as in a state habeas petition.

Although this clearly is an exhaustion argument, at the end of his discussion respondent inexplicably contends that "this claim should be found to be procedurally defaulted." As the California Supreme Court did not base its denial of review on any state procedural rule, and respondent has not provided any explanation why petitioner's

6

purported failure to fairly present the claim to that court would be a procedural default, this contention is rejected.

As to exhaustion, respondent advances two grounds for his contention that petitioner did not present this claim to the California Supreme Court: He contends that petitioner did not adequately indicate that he was raising a federal claim in the petition for review, and that the facts underlying the claim were not included in the petition. The second point applies, as respondent concedes, Resp't P & A at 10, only if petitioner is attempting to claim that evidence was admitted at trial that was obtained as a result of the recorded telephone calls. As petitioner makes no such claim, this part of respondent's exhaustion argument is irrelevant.

As to the first part of respondent's argument, the court need not resolve whether petitioner's contention in his petition for review that "[the prosecution's conduct was] in violation of petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments," Ex. G at 14, was sufficient to exhaust, because a federal district court may deny a petition on the merits even if it is unexhausted, 28 U.S.C. § 2254(b)(2), and petitioner's claims arising from the telephone calls will be denied, as discussed in the next section.

**2.  Merits**

Petitioner contends that the recording of several of his calls to his attorney violated his rights under the "Fifth, Sixth, and Fourteenth Amendments." Pet. at 6, 6a. He does not flesh out the reasoning for this claim, but instead refers to his appellate opening brief and reply brief "for full briefing and case citations." *Id.* at 6a. The opening brief contains little that develops the federal claims, but in it petitioner does cite *Rochin v. California*, 342 U.S. 165 (1952), in which the Supreme Court concluded that sufficiently outrageous governmental misconduct can violate substantive due process. *Id.* at 171-72. The only other federal case he cites is *Kastigar v. United States*, 406 U.S. 441 (1972), in support of his proposed remedy for such violations, which does not have any bearing on the nature of the constitutional claims themselves.

The court concludes that petitioner's Sixth Amendment claim is that the

7

prosecution's purported overhearing of his conversations with counsel rendered counsel ineffective. Because petitioner does not show that the prosecution listened to any of the conversations, does not challenge the trial court's conclusion that the conversation heard in part by the investigator contained nothing that could be used to the prosecution's advantage, and does not even allege that the trial was affected in any way, he has not shown that the recording impeded counsel's representation or that it prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Considered as a Sixth Amendment effective assistance of counsel claim, this claim is without merit.

Petitioner's other claim appears to be one of substantive due process, judging by the citation to *Rochin*.

"[T]he doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by courts. *See United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993) ("The banner of outrageous misconduct is often raised but seldom saluted."). Although litigants continue to assert the doctrine as a defense against conviction, "courts have rejected its application with almost monotonous regularity." *Id.* at 4 (collecting cases)." *United States v. Voigt*, 89 F.3d 1050, 1069 (3d Cir. 1996).

The Ninth Circuit has adopted a three-part test from *Voigt* for "Fifth Amendment claims based on allegations of an invasion of the attorney-client relationship." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008). "A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3) as a result, the defendant suffered actual and substantial prejudice." *Id.* (citing *Voigt*). "'"[A] claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice."'" *Id.* (quoting *Voigt*, 89 F.3d at 1067, as quoted in *United States v. Haynes*, 216 F3d 789, 797 (9th Cir. 2000)).

Here, petitioner makes no attempt whatever to point to actual and substantial prejudice, none appears on the record, and there is no evidence that the government's

8

1 actions were deliberate. Petitioner thus has failed to make out his substantive due process
2 claim. The rejections of this claim by the state appellate courts were not contrary to, or
3 unreasonable applications of, clearly-established United States Supreme Court authority.

### B.     Sufficiency of the Evidence

Petitioner contends that there was insufficient evidence to support the verdict on counts eight, thirteen and fifteen. Those counts were the attempted murder charges involving victims Kory, Kathy and Amber, the "Good Samaritans" who were trying to help Jane Doe and her children.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id.* at 324. The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Id.* at 324.

When considering a sufficiency of the evidence claim the Court must "view[] the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, so must assume that the jury believed the prosecution's witnesses.

Under California law, attempted murder requires "express malice; implied malice will not suffice." Ex. F (opinion of court of appeal) at 10. California recognizes, however, the concept of a kill zone: "[M]ultiple attempted murder convictions may be sustained on a 'kill zone,' or 'concurrent intent,' theory when the evidence shows the defendant used lethal force of a type and extent calculated to kill everyone in an area, including but not limited to the victim shown to be the defendant's primary target, as a means of accomplishing the

9

killing of the primary target.  [citation omitted]  Under such circumstances, a rational jury can conclude beyond a reasonable doubt that the defendant intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." *Id.* at 11.  This statement of California law is binding on this court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal habeas corpus court.)

Like the California Court of Appeal, this court does not "underestimate, as [petitioner] apparently does, the seriousness of these crimes, and the danger presented by intentionally driving a vehicle weighing over two tons into a group of people. The manner in which [petitioner] accelerated his jacked-up Blazer, with rails on the front, directly toward two little girls who, only moments earlier, he had threatened to kill, as well as towards innocent Good Samaritans who were in the immediate area attempting to comfort and protect them, is clearly indicative of an intent to kill everyone in the vicinity." Ex. F at 12.

In these circumstances, a rational jury could find that petitioner intended to kill anyone in the area of the girls, which included Kory, Kathy and Amber, the subjects of counts eight, thirteen and fifteen.  There was sufficient evidence to support the verdict on those counts, hence no constitutional violation.  This claim is rejected.

**II.     Appealability**

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal).  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has

10

1 rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

This was not a close case. For the reasons set out above, jurists of reason would not find the result debatable or wrong. A certificate of appealability will be denied. Petitioner is advised that he may not appeal the denial of a COA, but he may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a), Rules Governing § 2254 Cases.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. Petitioner's motion for a preliminary injunction (document number 15 on the docket) is **DENIED** as moot. A Certificate of Appealability also is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases (eff. Dec. 1, 2009).

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 20, 2010.

PHYLLIS J. HAMILTON
United States District Judge

P:\PRO-SE\PJH\HC.08\VANGUILDER3602.RUL.wpd